IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

JAMES O. GLOVER,

                     Plaintiff,             Civil Action No.
                                     5:06-CV-00195 (LEK/DEP)

      vs.

MICHAEL J. ASTRUE[1], Commissioner
of Social Security,

                   Defendant.

_____

APPEARANCES:                OF COUNSEL:

FOR PLAINTIFF:

LEGAL SERVICES OF CENTRAL    CHRISTOPHER J. CADIN, ESQ.
  NEW YORK, INC.
472 S. Salina St., Suite 300
Syracuse, NY 13202

LEGAL AID SOCIETY OF         PAUL J. LUPIA, ESQ.
  MID-NEW YORK, INC.
255 Genesee St., Second Floor
Utica, NY 13501

FOR DEFENDANT:

HON.  ANDREW BAXTER        WILLIAM H. PEASE, ESQ.

_____

[1]     Plaintiff's complaint, which was filed on February 14, 2006, named Jo Anne B. Barnhart, the former Commissioner of Social Security, as the defendant.  On February 12, 2007, Michael J. Astrue took office as Social Security Commissioner.  He has therefore been substituted as the named defendant in this matter pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, and no further action is required in order to effectuate this change.  *See* 42 U.S.C. § 405(g).

Acting United States Attorney        Assistant U.S. Attorney
Northern District of New York
P.O. Box 7198
100 S. Clinton Street
Syracuse, NY 13261-7198

OFFICE OF GENERAL COUNSEL    BARBARA L. SPIVAK, ESQ.
Social Security Administration      Chief Counsel, Region II
26 Federal Plaza
New York, NY 10278           SUSAN REISS, ESQ.
                             Assistant Regional Counsel

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

Plaintiff James O. Glover, who suffers from multiple diagnosed mental disorders as well as a long-standing alcohol and drug abuse condition, has commenced this proceeding to challenge the denial of his application for supplemental security income ("SSI") Social Security benefits.  That denial was based upon the conclusion of the administrative law judge ("ALJ") who decided the matter at the agency level that, notwithstanding his mental disorders, the plaintiff would not be disabled absent the impact of his drug and alcohol abuse.  Plaintiff contends the ALJ's finding that his disability was primarily the result of his drug and alcohol dependency is not supported by substantial evidence in the record, arguing that available evidence, including from treating sources, reveals that his substance abuse and alcoholism are secondary to the

2

significant, limiting diagnosed mental conditions which he experiences.

Having reviewed the record now before the court, considered in light of the parties' respective contentions, I find that the ALJ's determination is not supported by substantial evidence in the record.  Accordingly, I recommend reversal of the Commissioner's determination and a remand of the case to the agency for further consideration.

I.      BACKGROUND

Plaintiff was born in January of 1972, and was thirty-two years old at the time of the administrative hearing in this matter.  Administrative Transcript (Dkt. No. 6) at pp. 25, 83.[2]  Plaintiff attended school through the ninth grade, receiving no special educational services during the course of his schooling, but has since had no further formal education.  AT 48, 110, 128.

Plaintiff has a relatively sporadic history of employment.  A summary of plaintiff's earnings reveals that he received more than $400 in only two calendar years since 1987, including 1991 and 1999.[3]  AT 95.  Plaintiff's

---

[2]      Portions of the administrative transcript (Dkt.  No.  6), comprised of evidence and proceedings before the agency and filed by the Commissioner together with his answer, will be cited herein as "AT __".

[3]      Plaintiff also earned $375 or less during the years 1987, 1989, 1990, 2000, and 2001, and realized no earnings during 1988, 1992, 1993, 1994, 1995, 1996, 1997, and 1998.  AT 95.

most lengthy period of employment occurred during May through October of 1991, when he worked as a metal parts grinder on what appears to have been a full time basis.  AT 105.  Plaintiff resigned from that position, however, listing "anxiety and depression" as the reason for leaving the job. AT 105, 122.  More recently, plaintiff's last period of employment occurred during the winter of 2001, when he was employed as a ski lift attendant, working five days a week for between five and six hours each day.  AT 105, 122.  Plaintiff also withdrew from that job, however, and has listed problems with "anxiety" as his reason for leaving.  AT 122.

The plaintiff currently lives with his mother, who takes care of most of his domestic responsibilities, including cooking and cleaning.  AT 38, 121, 134.  Plaintiff has two minor children with his wife, from whom he is separated.   AT 46, 168, 198.   Out of fear Glover does not drive, AT 55, but does walk to the grocery store on occasion, including to purchase alcohol.  *See* AT 47.  Plaintiff does not frequently socialize with others, and claims to have no close friends.  AT 46, 134, 139.

The medical evidence in the record reveals that over the course of time plaintiff has undergone extensive evaluation and treatment for his mental health condition, and was hospitalized for psychiatric treatment on six occasions between December of 1995 and October of 2004.  AT 149-

4

50, 151-52, 153-61, 162-79, 180-202, 203-24, 234-47, 248-76, 277-338, 339-46, 347-53, 354-55, 356-414.

A.    Cayuga Medical Center

Plaintiff's first psychiatric hospitalization occurred between December 15 and 18, 1995.  AT 149-50.  In a discharge summary report regarding that treatment Dr. Joyce Leslie, a physician with the Cayuga Medical Center, located in Ithaca, New York noted that plaintiff drank "12-24 hours a day [and] has a history of blackouts."  AT 149.  Although the microfilm copy of that report contained within the record is somewhat unclear, it appears that Dr. Leslie reported that "[Glover] knows of no medical problems related to his alcohol use."  *Id.*  At the time of discharge, Dr. Leslie diagnosed the plaintiff as suffering, *inter alia*, from alcoholism, cocaine abuse, nicotine abuse, and a history of marijuana abuse, and noted that Atvium detoxification had been uneventful.  AT 149-50.

During his second hospitalization at the Cayuga Medical Center, extending from April 25 through 30, 1997, Glover was diagnosed by Arthur Cronen, M.D. as having an adjustment disorder with depressed mood, alcohol dependence, and polysubstance abuse.  AT 151.  In his report of that hospitalization, Dr. Cronen noted that Glover had experienced suicidal thoughts and "[h]e had been receiving therapy through the

5

alcoholism services of Cortland County."  *Id.*  Dr. Cronen noted "no

evidence of psychosis", and reported that plaintiff denied any suicidal

intention or homicidal ideation.  *Id.*  Plaintiff was started on a regimen of

twenty milligrams of Prozac "daily to deal with the depression," following

which he "fairly quickly improved with respect to his mood," and his

"suicidality remitted."  *Id.*  Dr. Cronen also prescribed fifty milligrams of

Trazodone to aid the plaintiff's sleep, and discussed a possible course of

Antabuse to "deal with his chronic and intermittent alcoholism."  AT 152.

### B.   Cortland Memorial Hospital

Plaintiff was voluntarily admitted to the Cortland Memorial Hospital

on February 6, 2002, complaining of anxiety over the fact that his

estranged wife was having an affair.[4]  AT 162-179.  Upon his discharge

from that facility on February 13, 2002, following intensive psychiatric

treatment, plaintiff was diagnosed with "[p]olysubstance abuse with

primary alcoholism" with a notation to "[r]ule out schizophrenia with

obsessive compulsive disorder vs. severe obsessive compulsive disorder

---

[4]     The record also contains mention of an earlier, two day hospitalization at
Cortland Memorial Hospital in September of 1999, apparently as a result of physical
injuries sustained by the plaintiff to his nose in a motor vehicle accident.  AT 153-54.
The report of that hospitalization is largely irrelevant to this proceeding; the only
noteworthy remark in that report is under "Social History" where it is noted that plaintiff
"admits to some social use of alcohol" and "[t]obacco use."  AT 154.

with psychotic symptoms."[5]  AT 162.   In her discharge summary, Dr.

Adele Pace noted plaintiff's "long history of drug and alcohol abuse dating

back to age 12," including a relapse after nine months following his 1997

hospitalization.  *Id.*  Dr. Pace also reported that although plaintiff felt

"uncomfortable in crowds" he "was notably more sociable on the Ward

[program] and very actively took part in groups," and further noted that he

had a "paranoid ideation," and that while he "denies bizarre delusion" she

believed that he was hearing voices.  AT 168.  Dr. Pace ordered an

alcohol detoxification program which was subsequently found to be

unnecessary as plaintiff "showed absolutely no signs of withdrawal."  AT

163.  Plaintiff was also started on Zyprexa for sleep and "pervasive

paranoia" and Celexa for "his antidepressant and antisocial phobia

properties."  *Id.*

Plaintiff again presented to the Cortland Memorial Emergency Room

on August 29, 2002, on this occasion in an intoxicated state, requesting

psychiatric admission.  AT 180-202.  Upon plaintiff's discharge from the

facility on September 3, 2002, Susan Watrous, M.D., diagnosed him as

suffering from "[m]ajor depressive disorder, recurrent, severe, without

---

[5]      During that visit plaintiff was also diagnosed by D.O. James Newman as
suffering from major depression.  AT 166.

psychotic features," as well as alcohol dependence and social phobia.  AT

180.  Dr. Watrous noted that plaintiff exhibited a "number of depressive

symptoms," including difficulty sleeping, poor appetite, a lack of energy,

poor self-esteem, and anxiety.  AT 184.   She also noted, however, that

the plaintiff "denie[d] any history of auditory hallucinations[,]" adding that

according to Glover, "he never gave any medications [including Celexa,

Zyprexa, Luvox, Wellbutrin, Risperdal, and Trazodone] an adequate trial,

as they interfered with his sexual functioning" and that he had previously

found Prozac and Zoloft "not helpful."  AT 180, 184-85.  Upon his

admission plaintiff was started on Serzone, and was found to "interact[ ]

well with peers and participate[ ] in activities."  AT 181.  Dr. Watrous noted

that plaintiff suffered from "suicidal ideation and depression, even when

sober", but upon discharge assigned plaintiff a global assessment of

functioning ("GAF") score of 65.[6]  AT 180, 185.

Plaintiff was again voluntarily admitted to the Cortland Memorial

Hospital between November 3 and 6, 2002.  AT 203.  At the time he

---

[6]      GAF is described as a "clinician's judgment of the individual's overall
level of functioning."  DIAGNOSTIC AND STATISTICAL MENTAL DISORDERS 32 (Am.
Psychiatric Assoc., 4th ed., Text Revision 2000) ("DSM-IV-TR").  A person with a GAF
score of 65 experiences some mild symptoms, such as depressed mood, or some
difficulty in social, occupational, or school functioning, but generally functions "pretty
well" and has some meaningful interpersonal relationships.  Id. at 34.

presented to the hospital's emergency room on that occasion, test results revealed that Glover had a blood alcohol level of .334 percent.  *Id.*  Upon his discharge, Dr. Watrous diagnosed the plaintiff with "[a]lcohol dependence[, d]epressive disorder NOS, rule out substance induced, rule out major depressive disorder," and social phobia, noting that he was "resistant to attending rehab or [Alcoholics Anonymous]."[7]  AT 203, 204.

Plaintiff was next admitted into the Cortland Memorial Hospital between September 3 and 9, 2003.  AT 248.   On that occasion the plaintiff's father took him to the hospital emergency room, following a release from jail, based upon Glover's assertion that he was planning to commit suicide through an overdose of alcohol and cocaine, and toward that end had been on a two-day binge beginning on August 28, 2003.  *Id.* During that hospitalization plaintiff stated that he was currently abusing alcohol and crack cocaine, and requested a referral into a drug and alcohol rehabilitation program.  AT 248, 249.  On examination, medical officials at the hospital discerned no evidence of depression, and noted

---

[7]      Plaintiff was discharged on November 6, 2002 into the custody of the Cortland Police Department based upon the pendency of charges, the nature of which were unknown to Dr. Watrous.  AT 205.

that plaintiff's affect was appropriate and his mood was almost euthymic.[8] AT 249.   Upon discharge, plaintiff was diagnosed with depressive disorder NOS, alcohol and crack cocaine dependence, and "[r]ule out depressive disorder secondary to substance abuse"; the discharge summary also noted the existence of a "[p]ersonality disorder NOS, rule out antisocial personality." AT 248.  In discussions with the plaintiff during that hospitalization, Dr. Hilda Jayawardena found that Glover gave his history in only a "vague and evasive" manner with "several discrepancies" but "gave seemingly plausible reasons" for those errors.  AT 249.  Dr. Jayawardena also noted that plaintiff admitted to "hearing voices occasionally" and having "paranoid ideas."  Id.  After being prescribed more medications, plaintiff was discharged "with referral back to his outpatient therapist while awaiting admission to the Bradford program." Id.

### C.   Bradford Regional Medical Center

On September 24, 2003, plaintiff complained that he was "getting real bad", and was admitted into the Bradford Regional Medical Center, where he remained through October 22, 2003.  AT 347-53.  While at

---

[8]      A person with a euthymic mood falls within the normal range – that is, he or she is neither depressed, nor is his or her mood elevated.  DSM-IV-TR at 825.

Bradford, plaintiff registered complaints of a "long-standing history of suspiciousness, auditory . . . and visual hallucinations", and stated to Dr. Roger R. Laroche, M.D., one of his care providers at the facility, that he used alcohol and cocaine to "diminish the intensity" of his hallucinations. AT 347.  While hospitalized at Bradford plaintiff was treated with Zyprexa, resulting in dramatic improvement including resolution of all of his schizophrenic symptoms.  AT 347-48.  Among the improvements noted in the discharge summary was the fact that plaintiff had "no further suspiciousness, brighter affective range, increased sociability, excellent hygiene, initiat[ed] conversation, bright mood and broad affect, laugh[ed] frequently, and demonstrat[ed] no negative or positive symptoms of any kind."  AT 347-48.  Upon his discharge, plaintiff was assigned a GAF score of 65, and his diagnosis included schizophrenia, in remission on medication; likely superimposed substance-induced psychotic disorder, in remission; major depression, in remission; and alcohol, cocaine, and nicotine dependence.  AT 348.

     D.    <u>Family Counseling Services of Cortland County, Inc.</u>

During the period extending from January 13, 2004 until September 20, 2004, plaintiff was also seen by various medical personnel at Family Counseling Services ("FCS").  AT 277-338.  Early reports reveal that

plaintiff cancelled, rescheduled, or did not show up for several appointments with FCS, *see* AT 280-84, 286, 290, 296-97, 303, 316, 318, but that when there he complained that his audio and visual hallucinations had again returned. *See* AT 334, 336. Jason Keicher, MSW (and later LMSW), was alerted by plaintiff's father on May 26, 2004 that Glover was "using" and might become suicidal. AT 302. In response, it was recommended that the father seek help for Glover either through the detoxification unit at Crouse Irving Memorial Hospital in Syracuse, New York, or at Cortland Memorial Hospital. *Id.* In a note of plaintiff's next visit with Keicher, it was reported plaintiff was "not taking his medications." AT 300. By July of 2004 plaintiff reported that he began to feel better, and was better able to sleep, perhaps due to medications. AT 294. A short time later, however, Glover relapsed into alcohol usage. AT 293. At the last FCS session reflected in the record, occurring on September 20, 2004, plaintiff  revealed that he still had ongoing hallucinations at his sister's home. AT 278.

On or about September 23, 2004 a psychiatric evaluation of the plaintiff was performed at the FCS by LMSW Jason Keicher. AT 339-46. In a report of his evaluation, co-signed by plaintiff's treating psychiatrist, Dr. Mary Hartshorn, Keicher diagnosed the plaintiff as suffering from

schizoaffective disorder (295.70)[9] and post-traumatic stress disorder ("PTSD") (309.81).[10]  That report also noted that plaintiff suffered from depressive syndrome, manic syndrome, hallucinations, flat affect, difficulty in participating in activities, and some difficulty in participating in social functioning, adding that plaintiff's symptoms were "attenuated by medication or psychosocial support."  AT 340-41, 343, 345.

On October 19, 2004, a letter was sent from FCS to the plaintiff's legal counsel describing Glover's mental condition.  AT 354-55.  In that letter, which was signed by Kimberly Taylor, LMSW, a chemical dependence counselor; Jason Keicher, LMSW; and Beth Salce, LMSW, a senior counselor, it is stated that plaintiff was admitted for treatment on October 4, 2004 and that "[i]t has become apparent since [plaintiff's] admission that Mr. Glover's mental health issues are his primary problem and that he utilizes alcohol as a form of self medication."  AT 354-55. Significantly, the letter also notes that plaintiff "continues to experience

---

[9]      According to the DSM, schizoaffective disorder (295.70) is an illness featuring "a Major Depressive, Manic, or Mixed Episode concurrent with symptoms that meet Criterion A for Schizophrenia[,] . . . delusions or hallucinations for at least 2 weeks in the absence of prominent mood symptoms[,] . . . and [t]he symptoms must not be due to the direct physiological effects of a substance (e.g., cocaine) or a general medical condition." DSM-IV-TR at 319.  The symptoms of this disorder "may occur in a variety of temporal patterns." *Id.* at 320.

[10]      *See* DSM-IV-TR at 463.

symptoms of his mental illness despite the absence of alcohol."  AT 354.

     E.    <u>Other Examinations</u>

In addition to his treatments at the Caygua, Cortland, and Bradford facilities, it appears that plaintiff underwent psychological testing elsewhere.  On July 7, 2003, a consultative psychological evaluation of the plaintiff was conducted at by Kristen Barry, Ph.D. of Industrial Medicine Associates, P.C.  AT 225-29.  Based upon her examination, Dr. Barry noted that plaintiff "states that he self-medicated a lot with alcohol in the past,"  "believes he has been depressed for as long as he can remember," feels "paranoid," and suffers from auditory and visual hallucinations.  AT 226.  Dr. Barry diagnosed plaintiff with social phobia, depressive disorder, NOS; rule out agoraphobia; alcohol dependence, reported in remission; and personality disorder, NOS.  AT 228.

A mental residual functional capacity ("RFC") assessment and a psychiatric review technique form, both apparently prepared by A. Del Nero and signed by Kusum Walia, Ph.D. on July 31, 2003, reveal an opinion that plaintiff suffers from depression, a personality disorder, and a history of substance abuse, designated as "in remission." AT 237, 241, 242.  The psychiatric review form also reveals only mild limitations in the areas of plaintiff's daily living activities and in maintaining concentration,

persistence, or pace, and moderate limitations in maintaining social

functioning.  AT 244.  Plaintiff's mental RFC form noted no significant

limitation on his ability to sustain concentration, to interact socially, to

adapt, and to understand and use his memory, outside of being

"moderately limited" in "[t]he ability to respond appropriately to changes in

the work setting."  AT 230-33.

Also present in the record are numerous additional medical records

concerning evaluations of the plaintiff performed at Cortland County

Mental Health Clinic between May 30, 2000 and June 23, 2004. AT 356-

414.  In notes of treatment sessions spanning over the course of a year

from November 2002 until the following November, Dr. David R. Sillars

reports that plaintiff told him of intermittent suicidal feelings, depression,

anxiety, and hallucinations.  AT 370, 379, 386, 394, 401, 404-05.

II.    PROCEDURAL HISTORY

A.    Proceedings Before the Agency

Plaintiff filed an application for SSI benefits under Title XVI of the

Social Security Act on April 8, 2003, alleging a disability onset date of

February 1, 2002.  AT 82-89.  That application was denied on July 15,

2003.  AT 63–66.

At plaintiff's request, AT 73, a hearing was held before ALJ Sue Ann

Strauss on September 24, 2004 to address plaintiff's claim for benefits under the Act. AT 33-62. Plaintiff testified at the hearing and was assisted by Susan Bosworth-Quinlan, an attorney with the Legal Services of Central New York. AT 33-62, 354. Also testifying at the hearing was the plaintiff's mother, Diane Almeido.[11] AT 33-62.

Following the hearing, ALJ Strauss issued a decision dated December 8, 2004, in which, after engaging in the required *de novo* review, she found that the plaintiff was not entitled to received SSI benefits. AT 18-25. In that decision, ALJ Strauss employed the familiar five-step test for determining disability. At step one, she determined that plaintiff had not engaged in "any substantial gainful activity" since April 8, 2003, the date of filing of plaintiff's application for SSI benefits. AT 19. ALJ Strauss next found at step two that plaintiff suffered from "[d]epression and alcohol and substance abuse" and that they constituted sufficiently severe impairments "because they have had more than a minimal effect on the claimant's ability to perform basic work activities." *Id.* (citing 20 C.F.R. § 416.920(c)).

At step three of the required analysis, the ALJ determined that

---

[11]     Although a vocational expert was also present at the hearing, the ALJ did not find it necessary to elicit her testimony, in light of the nature of the case. AT 61.

plaintiff's condition meets the objective criteria of affective disorders and substance abuse disorders, two of the presumptively disabling impairments listed in the governing regulations, 20 C.F.R. Pt. 404, Subpt. P. App. 1.  AT 20 (citing 20 C.F.R. § 416.925).   ALJ Strauss additionally found, however, that plaintiff's alcohol abuse and substance abuse were contributing factors, or "material", to the plaintiff's disabilities, and that plaintiff had not proven that in the absence of such abuse, he would nonetheless experience impairments sufficient to establish a disability based upon the listings.  AT 20-21.

The ALJ then turned to an assessment of plaintiff's RFC in the absence of plaintiff's alcohol and substance abuse issues, determining that the plaintiff "had no exertional limitations" but was subject to "nonexertional limitations [of s]imple repetitive work without public contact."  AT 21-22.  Assessing credibility of the hearing witnesses, ALJ Strauss "only partially accepted" the testimony of plaintiff's mother, based in part upon her apparent unawareness that plaintiff was leaving her "house on a frequent basis to buy beer" and "consistently minimized [plaintiff's] substance abuse problem."  AT 23.  The ALJ also found that plaintiff's testimony was "not fully credible" since his statements "describe[d] a level of disabling symptoms which exceed what the

objective evidence and clinical findings could reasonably be expected to produce."  AT 23.

At step four of the analysis, the ALJ found that the plaintiff's previous work "as a machine parts painter [did] not require the performance of work-related activities precluded by" the determined limitations, and he therefore was not disabled as defined in the Social Security Act because he was able to perform his past relevant work, thus making it unnecessary to proceed to step five of the disability algorithm. AT 23.  The ALJ's ruling became a final determination of the agency on December 20, 2005, when the Social Security Administration Appeals Council denied plaintiff's request for a review of that decision.  AT 7-10.

B.    Proceedings In This Action

Plaintiff commenced this action on February 14, 2006.  Dkt. No. 1. Issue was thereafter joined by the Commissioner's filing of an answer on June 2, 2006, accompanied by an administrative transcript of the evidence and proceedings before the agency.  Dkt. Nos. 5, 6.

With the filing of plaintiff's brief on July 26, 2006, Dkt. No. 8, and that on behalf of the Commissioner on November 29, 2006, Dkt. No. 11, the matter is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. §

636(b)(1)(B) and Northern District of New York Local Rule 72.3(d).[12]  *See also* FED. R. CIV. P. 72(b).

III.    DISCUSSION

    A.    Scope of Review

     A court's review under 42 U.S.C. § 405(g) of a final decision by the Commissioner is limited; that review requires a determination of whether the correct legal standards were applied, and whether the decision is supported by substantial evidence.  *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002); *Shaw v. Chater,* 221 F.3d 126, 131 (2d Cir. 2000); *Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir. 1998); *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (Hurd, J.) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).   Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, his or her decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence.  *Martone*, 70 F. Supp. 2d at 148 (citing *Johnson*, 817 F.2d at 986).  If, however, the

---

[12]     This matter has been treated in accordance with the procedures set forth in General Order No. 18 (formerly, General Order No. 43) which was issued by the Hon. Ralph W. Smith, Jr., Chief United States Magistrate Judge, on January 28, 1998, and subsequently amended and reissued by Chief District Judge Frederick J. Scullin, Jr., on September 12, 2003.  Under that General Order an action such as this is considered procedurally, once issue has been joined, as if cross-motions for judgment on the pleadings had been filed pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

correct legal standards have been applied and the ALJ's findings are
supported by substantial evidence, those findings are conclusive, and the
decision should withstand judicial scrutiny regardless of whether the
reviewing court might have reached a contrary result if acting as the trier
of fact.  *Veino*, 312 F.3d at 586; *Williams v. Bowen*, 859 F.2d 255, 258 (2d
Cir. 1988); *Barnett v. Apfel,* 13 F. Supp. 2d 312, 314 (N.D.N.Y. 1998)
(Hurd, M.J.); *see also* 42 U.S.C. § 405(g).

     The term "substantial evidence" has been defined as "'such relevant
evidence as a reasonable mind might accept as adequate to support a
conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420,
1427 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197,
229, 59 S. Ct. 206, 217 (1938)); *Jasinski v. Barnhart*, 341 F.3d 182, 184
(2d Cir. 2003).  To be substantial, there must be "'more than a mere
scintilla'" of evidence scattered throughout the administrative record.
*Richardson*, 402 U.S. at 401, 91 S. Ct. at 1427; *Martone,* 70 F. Supp. 2d
at 148 (citing *Richardson*).  "To determine on appeal whether an ALJ's
findings are supported by substantial evidence, a reviewing court
considers the whole record, examining the evidence from both sides,
because an analysis of the substantiality of the evidence must also
include that which detracts from its weight."  *Williams*, 859 F.2d at 258

(citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 715 S. Ct. 456, 464 (1951)).

When a reviewing court concludes that incorrect legal standards have been applied, and/or that substantial evidence does not support the agency's determination, the agency's decision should be reversed.  42 U.S.C. § 405(g); *see Martone*, 70 F. Supp. 2d at 148.  In such a case the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), particularly if deemed necessary to allow the ALJ to develop a full and fair record or to explain his or her reasoning.  *Martone*, 70 F. Supp. 2d at 148 (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)).  A remand pursuant to sentence six of section 405(g) is warranted if new, non-cumulative evidence proffered to the district court should be considered at the agency level.  *See Lisa v. Sec'y of Dep't of Health and Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991).  Reversal without remand, while unusual, is appropriate when there is "persuasive proof of disability" in the record and it would serve no useful purpose to remand the matter for further proceedings before the agency.  *See Parker*, 626 F.2d at 235; *see also Simmons v. United States R.R. Ret. Bd.,* 982 F.2d 49, 57 (2d Cir. 1992); *Carroll v. Sec'y of Health and Human Servs*., 705 F.2d 638, 644 (2d Cir. 1983).

B.    Disability Determination - The Five Step Evaluation Process

The Social Security Act defines "disability" to include the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A). In addition, the Act requires that a claimant's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.* § 423(d)(2)(A).

The agency has prescribed a five step evaluative process to be employed in determining whether an individual is disabled.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The first step requires a determination of whether the claimant is engaging in substantial gainful activity; if so, then the claimant is not disabled, and the inquiry need proceed no further.  *Id.* §§ 404.1520(b), 416.920(b).  If the claimant is not gainfully employed, then

22

the second step involves an examination of whether the claimant has a severe impairment or combination of impairments which significantly restricts his or her physical or mental ability to perform basic work activities.  *Id.* §§ 404.1520(c), 416.920(c).  If the claimant is found to suffer from such an impairment, the agency must next determine whether it meets or equals an impairment listed in Appendix 1 of the regulations.  *Id.* §§ 404.1520(d), 416.920(d); *see also id.* Part 404, Subpt. P, App. 1.  If so, then the claimant is "presumptively disabled."  *Martone*, 70 F. Supp. 2d at 149 (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)); 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not presumptively disabled, step four requires an assessment of whether the claimant's residual functional capacity ("RFC") precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  If it is determined that it does, then as a final matter the agency must examine whether the claimant can do any other work.  *Id.* §§ 404.1520(g), 416.920(g).

    C.    <u>The Evidence In This Case</u>

The record convincingly discloses, and plaintiff does not deny, that he suffers from a long history of drug and alcohol abuse and that the condition appears to be significantly intertwined with the various mental

disorders discerned and treated over the years by plaintiff's mental health care providers.  In light of plaintiff's admitted history of alcohol abuse, the Commissioner's determination must be reviewed in the context of the Contract with America Advancement Act of 1996 ("CAAA"), PUB. L. 104-121, 110 STAT. 847, legislation which significantly altered the landscape in cases where alcoholism is implicated.  Under the CAAA, which is codified in part at 42 U.S.C. § 423(d)(2)(C), an individual is not considered disabled for purposes of disability insurance and SSI benefits "if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."  42 U.S.C. § 423 (d)(2)(C); *see also* 20 C.F.R. § 416.935; *Curtis v. Comm'r of Soc. Sec.*, No. 5:04-CV-527, slip. op. at 25-26 (N.D.N.Y. July 12, 2006).

In determining whether alcoholism is a contributing factor material to the determination of disability, both the Commissioner and a reviewing court must look to whether the claimant is disabled, and if so whether he or she would still be disabled absent the use of drugs or alcohol.  20 C.F.R. § 416.935; *see also Frederick v. Barnhart*, 317 F. Supp. 2d 286, 290 (W.D.N.Y. 2004).  Put another way, an ALJ analyzing a situation involving the use of drugs or alcohol must determine first whether the

claimant's physical or mental limitations would remain even after use of drugs and alcohol had ended, and if so whether those remaining limitations would in and of themselves be disabling; if not, then the claimant's alcoholism or drug addiction is properly regarded as a contributing factor material to the determination and, consequently, benefits must be denied under the CAAA.  *See Frederick*, 317 F. Supp. 2d at 290.

The burden of demonstrating that substance abuse is not a contributing factor material to the disability determination rests with the claimant.  *White v. Commissioner,* 302 F. Supp.2d 170, 173 (W.D.N.Y. 2004) (*citing Brueggemann v. Barnhart,* 348 F.3d 689, 693 (8th Cir. 2003)).  The mere fact that a claimant has continued in his or her substance abuse, however, is not alone dispositive of this issue.  *White,* 302 F. Supp.2d at 177 n.6.

In her opinion, the  ALJ found that the only consistently diagnosed conditions that the plaintiff suffered from were "[d]epression and alcohol and substance abuse." AT 19.  The ALJ recognized but discounted "a variety of other mental impairments, ranging from schizophrenia to [a] personality disorder" because they were not "consistent[ly]" recognized throughout plaintiff's hospital visits and evaluations.  AT 24.  Ultimately,

25

the ALJ concluded that although the plaintiff is disabled, his disability is primarily the result of his alcohol and drug abuse, and that if he did not indulge in such substance abuse, he would not be disabled. AT 24-25.

To be sure, the evidence in the record as relates to the interplay between plaintiff's obvious and significant substance and alcohol abuse condition and his acknowledged mental disorder is equivocal.  A considerable body of the evidence, including reports related to plaintiff's earlier hospitalizations, appear to place primary emphasis upon his substance abuse, and suggest that it predominates.  *See, e.g.* AT 149-50, 162, 203-04, 248-49.  Later reports, however, including from treatment providers at FCS, suggest otherwise, with some going so far as to suggest, including in a letter dated October 19, 2004, that the claimant's "mental health issues are his primary problem, and that he utilizes alcohol as a form of self-medication in an effort to obtain some sleep, and have a reprieve from the hallucinations."  AT 354-55; *see also* AT 225-29, 339-46.

In arriving at a decision, an ALJ is not required to reconcile every potentially conflicting piece of medical evidence; a court, however, "will not accept 'an unreasoned rejection of all the medical evidence in a claimant's favor.'"  *Galiotti v. Astrue*, 266 Fed. App'x 66, 67 (2d. Cir. 2008)  (citing *Fiorello*, 725 F.2d at 176).  It is equally true that when arriving at a

decision as to whether a plaintiff is disabled, an ALJ is not free to choose only evidence which supports one side or the other, but instead must examine all of the evidence before the agency, even if internally conflicting.  *See Fiorello*, 725 F.2d at 176.

Although the ALJ followed the correct legal standard to be applied in analyzing the materiality of plaintiff's alcohol and substance abuse problems to his mental health conditions, AT 20-21, it is not at all clear that the evidence was properly weighed. In addition to the treating physician issue discussed below, it appears that the ALJ may have been focusing only upon the evidence most favorable to her decision.  By discounting evidence of plaintiff's treating physician, Dr. Mary Hartshorn, and the previously-referenced letter from FCS, the ALJ effectively refused to examine whether or not plaintiff might be disabled by way of a schizoaffective or post-traumatic stress disorder. *See* AT 339-46, 354-55. Additionally, the ALJ's examination of the plaintiff at his hearing appears to have consisted predominately of questions pertaining to his drug and alcohol use, AT 47, 58-59, and ended with her stating that "I don't think this is a case for the vocational expert. This is really a drug and alcohol

case."[13]  AT 61.

Because reasonable doubt exists as to whether the ALJ deliberately chose only the medical evidence favorable to her determination of no disability by reason of plaintiff's drug and alcohol usage, I recommend a remand for the purpose of reconsidering whether the evidence proffered by the plaintiff was sufficient to give rise to a finding of disability.

### 2.    Treating Physician

_____Embedded within plaintiff's argument in this case is the contention that the opinions of one of his treating sources, psychiatrist Dr. Mary Hartshorn, were improperly discounted without either a sufficient basis or a proper explanation.

_____Ordinarily, the opinion of a treating physician is entitled to considerable deference, provided that it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.  *Veino*, 312 F.3d at 588; *Barnett*, 13 F. Supp. 2d at 316.[14]  Such opinions are not controlling,

---

[13]      It is true that despite making this rather illuminating statement, the ALJ nonetheless held the record open for thirty days following the hearing in order to permit the plaintiff to submit additional medical information.  AT 61.

[14]      The regulation which governs treating physicians provides:

> Generally, we give more weight to opinions
> from your treating sources . . . . If we find that

however, if contrary to other substantial evidence in the record, including

the opinions of other medical experts.  *Halloran v. Barnhart*, 362 F.3d 28,

32 (2d Cir. 2004); *Veino*, 312 F.3d at 588.  Where conflicts arise in the

form of contradictory medical evidence, their resolution is properly

entrusted to the Commissioner.  *Veino*, 312 F.3d at 588.

In deciding what weight, if any, an ALJ should accord to medical

opinions, he or she may consider a variety of factors including "[t]he

duration of a patient-physician relationship, the reasoning accompanying

the opinion, the opinion's consistency with other evidence, and the

physician's specialization or lack thereof[.]"  *Schisler v. Sullivan*, 3 F.3d

563, 568 (2d Cir. 1993) (discussing 20 C.F.R. §§ 404.1527, 416.927).

When a treating physician's opinions are repudiated, the ALJ must provide

reasons for the rejection.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

---

a treating source's opinion on the issue(s) of
the nature and severity of your impairment(s)
is well-supported by medically acceptable
clinical and laboratory diagnostic techniques
and is not inconsistent with the other
substantial evidence in your case record, we
will give it controlling weight.   When we do
not give the treating source's opinion
controlling weight, we apply [various factors]
in determining the weight to give the opinion.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Failure to apply the appropriate legal standards for considering a treating physician's opinions is a proper basis for reversal and remand, as is the failure to provide reasons for rejection of his or her opinions.  *Johnson*, 817 F.2d at 985-86; *Barnett*, 13 F. Supp. 2d at 316-17.

In an evaluation prepared in September of 2004 by LMSW Keicher, and endorsed by Dr. Hartshorn, plaintiff's treating psychiatrist, an Axis I diagnosis of schizoaffective disorder and PTSD was made.[15]  AT 339. Those conditions, which were not considered by the ALJ, would significantly alter the materiality analysis.  It should be recalled, at the outset, that the threshold showing required in order to establish the requisite level of severity of step two of the sequential analysis is modest, intended to eliminate only conditions with minimal impact on a claimant's ability to perform work related functions.  *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995); *see also Antonetti v. Barnhart*, 399 F. Supp. 2d 199,

---

[15]     The evaluation was given "no weight" by the ALJ in light of its failure to discuss the effect of plaintiff's alcohol and substance abuse.  AT 21.  It is undeniably somewhat unclear as to whether or not the diagnoses in this report take into consideration the plaintiff's use of drugs and alcohol.  Contained within the evaluation is a notation under the heading "Part B And C" to "Please Complete This Form Without Considering Limitations, If Any Caused By Alcohol Or Drug Dependence."  AT 343. These two parts appear to discuss primarily the plaintiff's ability to perform tasks necessary for social and work interaction.  AT 343-46.  Plaintiff's diagnoses of schizoaffective disorder and post-traumatic stress disorder occur well before this notation, in what appear to be Part A, and it is therefore uncertain at best as to whether these diagnoses were made in light of, or instead independent of, plaintiff's alcohol and drug abuse issues.  AT 339-42.

203 (W.D.N.Y. 2005) (noting that the step two severity test "is not a difficult standard to meet and is intended merely to weed out de minimus claims").  While I do not necessarily agree with plaintiff's contention that the record establishes that a personality disorder has been diagnosed, as opposed to simply needing to be ruled out, I do concur that based upon the record, at least one treating source has diagnosed the plaintiff as suffering from schizoaffective disorder, and no medical evidence in the record specifically contradicts such a finding.[16]  The fact that this is an isolated diagnoses does not in and of itself invalidate the finding.  *See Gallivan v. Apfel*, 88 F. Supp. 2d 92, 98 (W.D.N.Y. 2000).

It should also be noted that authoritative sources reflect considerable interplay between schizoaffective disorders and depression. The DSM defines schizoaffective disorder (295.70) as follows:

> A.    An uninterrupted period of illness during which, at some time, there is either a Major Depressive Episode, a Manic Episode, or a Mixed Episode concurrent with symptoms that meet Criterion A for Schizophrenia.
>
> **Note:** The Major Depressive Episode must include

---

[16]    It is noteworthy that this evaluation was completed well after the medical evidence relied on by the ALJ in her decision, including the Cayuga Medical Center discharge summary (dated April 25 through April 30, 1997, AT 151, Cortland Memorial Hospital discharge summaries (dated February 13, 2002, September 3, 2002, November 6, 2002, and September 9, 2003), AT 162, 180, 203, 248, and the Bradford Regional Medical Center discharge summary (dated October 22, 2003).  AT 347; *see also* AT 19, 22.

Criterion A1: depressed mood.

B.   During the same period of illness, there have been delusions or hallucinations for at least 2 weeks in the absence of prominent mood symptoms.

C.   Symptoms that meet criteria for a mood episode are present for a substance portion of the total duration of the active and residual periods of the illness.

D.   The disturbance is not due to the direct physiological effects of a substance (e.g., a drug of abuse, a medication) or a general medical condition.

DSM-IV-TR at 323.  As can be seen, this diagnosis includes depressed mood and major depression, both found by the ALJ to be severe and consistent, together with hallucinations and flattening affect.

In sum, I note that the ALJ's discussion regarding the basis for her rejection of Dr. Hartsworn's report is lacking in detail and support. Because it appears that the opinions of Dr. Hartsworn were not afforded controlling weight, and the basis for rejecting those opinions is neither sufficiently articulated nor supported by substantial evidence, I recommend reversal and remand to the agency for further consideration.

3.   Opinions of Plaintiff's Counselors

In his brief, plaintiff also appears to argue that a reversal and remand is proper because a letter from his counselors at FCS was not accorded sufficient weight.  Plaintiff's Brief (Dkt. No. 8) at p. 20.  In her

opinion, the ALJ wrote that she gave "[a]ppropriate weight" to a letter from

FCS dated October 19, 2004 and signed by Chemical Dependence

Counselor Kimberly Taylor, Mental Health Counselor Jason Keicher, and a

Senior Counselor Beth Salce. AT 21, 354-55.  In that letter, it was stated

that the plaintiff's "mental health issues are his primary problem, and that

he utilizes alcohol as a form of self medication in an effort to obtain some

sleep, and have a reprieve from the hallucinations" and "continues to

experience symptoms of his mental illness despite the absence of

alcohol."  AT 354.  The ALJ found this letter not to be dispositive because

"it does not address in any detail the severity of the claimant's mental

limitations both with and without taking into account the effects of his

alcohol and substance abuse."  AT 21.

Because this letter is not signed by a treating physician, but rather

only by three counselors, it is not entitled to controlling weight.  *See* 20

C.F.R. §§ 416.913(a), 416.913(d); *see also Cirino v. Apfel*, 34 F. Supp. 2d

861, 864-65 (E.D.N.Y. 1999) (noting that rehabilitation counselors'

opinions are entitled to less deference than other medical professionals);

*cf. Barringer v. Comm'r of Soc. Sec.*, 358 F. Supp. 2d 67, 79 (N.D.N.Y.

2005) (Sharpe, J.) (noting that state agency consultants can provide

information carrying some evidentiary weight).  This does not mean,

however, that the opinions set forth are entitled to no weight; rather, the

letter may be considered as a source of evidence under 20 C.F.R. §

416.913(d). *See Barilla v. Astrue*, No. 8:05-CV-01237, 2008 WL 697390,

at *1 (N.D.N.Y. 2008) (Peebles, M.J.) (noting that evidence from medical

personnel other than physicians may be considered).  Further, Social

Security Ruling "SSR" 06-03p provides that an ALJ "generally should

explain the weight given to opinions from . . . 'other sources.'" SSR 06-

03p, 2006 WL 2329939, at *6, *Titles II and XVI: Considering Opinions and

Other Evidence From Sources Who Are Not "Acceptable Medical

Sources" in Disability Claims* (S.S.A. 2006).

In this case, it does not appear that a reversal and remand is proper

solely on the ground of the ALJ's treatment of this letter.  Although the

letter does appear to be helpful as an indicator of plaintiff's mental

condition, an ALJ is vested with considerable discretion to determine what

evidentiary weight a particular piece of medical evidence carries.  *See

Monette v. Astrue*, 269 Fed. App'x 109, 113 (2d Cir. 2008).  Despite the

fact that it is unclear what sort of "appropriate" weight was ascribed to this

letter, because it is not entitled to controlling weight, and in light of my

conclusions regarding the treating physician issue, I recommend a finding

that the issue plaintiff has raised pertaining to the FCS letter is not

sufficient, in and of itself, to constitute a ground for reversal and remand.

IV.    <u>SUMMARY AND RECOMMENDATION</u>

The ALJ's determination in this matter, finding that plaintiff was not disabled, failed to properly take into consideration the diagnoses of a treating physician which may result in a finding of disability under the controlling Social Security jurisprudence.  Moreover, in light of the short shrift given to plaintiff's treating physician's evaluation, it appears that in coming to her conclusions the ALJ may have wrongfully chosen to rely only upon medical evidence favorable to her decision, based upon her apparent perception that plaintiff's severe drug and alcohol dependency are at the root of his mental limitations, and not upon other evidence present in the record which help to substantiate plaintiff's claim of disability, including contrary opinions of plaintiff's counselors.  Accordingly, I find that a reversal and remand is proper in light of the errors of law present in the ALJ's determination.[17]  It is therefore hereby

---

[17]     Although plaintiff seeks remand solely for the calculation of benefits, such a course of action is not appropriate in this case.  Reversal and remand for the calculation of benefits is only warranted "when there is 'persuasive proof of disability' [in the record] and further development of the record would not serve any purpose." *Steficek v. Barnhart*, 462 F. Supp. 2d 415, 418 (W.D.N.Y. 2006) (quoting *Rosa v. Callahan*, 168 F.3d 72,  83 (2d Cir. 1999)).  Remand for further consideration, on the other hand, is justified when the ALJ has applied an improper legal standard, or further findings and explanations would clarify the ALJ's decision.  *See Rosa,* 168 F.3d at 82-83; *Parker v. Harris,* 626 F.2d 225, 235 (2d Cir. 1980); *Steficek*, 462 F. Supp. 2d at 418 (citing *Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir. 1996)).  In this instance, remand is

RECOMMENDED that the plaintiff's motion for judgment on the pleadings be GRANTED, the Commissioner's determination of no disability VACATED, and the matter REMANDED to the agency for further consideration.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court within ten (10) days.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

IT IS FURTHER ORDERED, that the Clerk of the Court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:       December 01, 2008
             Syracuse, NY

---

required for the purpose of making further findings and offering additional explanations of the evidence, and not because of a finding that there is persuasive proof of disability in the existing record.